### THE TYDOL.

### TIDE WATER OIL CO. v. NEW YORK, N. H. & H. R. CO.

### THE TRANSFER NO. 14.

### THE NO. 54.

#### Nos. 14362, 14401.

District Court, E. D. New York.

Jan. 6, 1936.

Emery & Pyne, of New York City (Vincent A. Catoggio, Jr., and W. Pyne, both of New York City, of counsel), for libelant.

Duncan & Mount, of New York City (H. W. Dieck, Jr., and C. R. Millett, both of New York City, of counsel), for respondent and cross-libelant.

GALSTON, District Judge.

On the morning of May 4, 1934, a collision occurred between the motor vessel Tydol and carfloat No. 54 in tow of Transfer No. 14, in the vicinity of Hallett's Point, about 1,000 feet southwest, and near the Astoria shore.

A heavy fog prevailed. The Tydol, a boat 250 feet in length and 48-foot beam, equipped with Diesel engines and twin screws, left Bayonne, N. J., at about 6 a. m. and proceeded through the upper bay, Buttermilk Channel and the East River, following the westerly side of Blackwell's Island at varying slow speeds. Approaching a point opposite Eighty-Sixth street, Manhattan, the Tydol stopped momentarily, then proceeded past the north end of Blackwell's Island and Eighty-Sixth street, angling for the Astoria shore. At about that time the captain heard a tow whistle from a vessel heard approaching from the opposite direction, and nevertheless maintained his course towards the Astoria shore. He heard then a two-whistle signal, then a fog signal from the tug with its tow. After he received a second two-whistle signal, he set his engines full astern and blew three whistles. The visi-

bility was bad, though he could distinguish, at the time he heard the two whistle signal, the lines of the Astoria shore.

The Transfer No. 14 left Oak Point. She had in tow the carfloats No. 54 and No. 55 bound for the Central Railroad of New Jersey. These are steel floats and were loaded. The No. 54 was on the port side; the No. 55 on the starboard side. The floats projected about half their length ahead of the stem of the tug. The length of the floats was 327 feet, beam 41 feet. The floats were made fast securely to the tug with a 6½-inch tow line, double, and a 5½-inch stern line, four parts, and a 5½-inch head line, three parts, on each float, and a 5½-inch double cross line between the two floats. This brought the bows of the two floats about 10 feet apart. Thus made up, the floats projected both ahead of the bow and to the aft of the stern of the tug. Between the floats at the stern there was a clearance of about 36 feet. Coming down the river, the fog signals were continually blown. The weather thickened in the vicinity of Sunken Meadow. A lookout was stationed on the port float on the top of the cars; there was also a lookout stationed on the bow of the starboard float. The tow proceeded at slow speed. The tide was the first of the flood. From Negro Point they steered towards Hallett's Point, and, in cutting across to Hallett's Point, in addition to fog whistles, a bend whistle was signaled. With the flood prevailing it seems to be an established custom of navigation for a westbound vessel to hug the Astoria shore around Hallett's Point and pass an eastbound vessel starboard to starboard. The tow passed about 200 feet off the light at Hallett's Point in making the turn and continued down the Astoria shore about 200 feet off. The captain sought to land 500 or 600 feet below Hallett's Point at the power house dock, which is the only available dock on which they could get a line to the Astoria shore. This was made

necessary by increasing thickness of fog. As the tow was thus proceeding down the Astoria shore under a slow bell, a vessel was heard coming up the channel blowing fog signals. This was located by the captain of the tug on his starboard bow about 2 points off. The tug signaled for a starboard to starboard passing. Following that, whether in response or not does not appear, the Tydol blew one whistle longer than the one before and sheered to starboard, changing from a northeast direction to east southeast. This maneuver was followed by three whistles to indicate that the Tydol was backing. The tug stopped and backed and also blew 3 whistles, but the Tydol crossed the tug's bow and struck the bow, of the port float.

The foregoing is substantially the version of the master of the tug, and I accept that version particularly because it seems most unlikely that with the tow made up as described the accident could have happened as the master of the Tydol testified. He said that the port carfloat was adrift before the collision and was separated from the tug by from 100 to 150 feet.

I can find no fault in the navigation of the tug. In addition to maintaining a proper speed and pursuing a well-recognized course, she had lookouts stationed on both floats, and accordingly did everything that proper navigation required. Even Clark, called in rebuttal by the libelant, confirmed the existence of the custom with respect to navigating between Hallett's Point and Negro Point. This collision would not have occurred if the Tydol had not sought improperly to cross the bow of the tug.

Decrees may be entered dismissing the libel of the Tide Water Oil Company and sustaining the cross libel. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.